**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| 11333 Incorporated,<br><br>                Plaintiff,<br><br>v.<br><br>Certain Underwriters at Lloyd's, London, et al.,<br><br>                Defendants. | No. CV-14-02001-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendants' Motion to Dismiss First Amended Complaint (Doc. 32). For the reasons that follow, the Motion will be denied.

**I.     FACTUAL ALLEGATIONS AND POLICY LANGUAGE**

On May 15, 2003, Plaintiff 11333, Inc., f/k/a/ Investors Mortgage Holdings, Inc., became the "exclusive manager" of IMH Secured Loan Fund, LLC ("the Fund"). (Doc. 23 at 2-3.) In that capacity, Plaintiff was responsible for servicing the Fund's loans, managing, operating and developing the Fund's properties, and purchasing liability and other insurance on those properties. (*Id.* at 3.) According to Plaintiff, it "had a fiduciary responsibility for the safekeeping and use of all of the Fund's assets and funds." (*Id.*) Plaintiff hired Defendant HUB International Insurance Services, Inc. ("HUB") to assist in buying mortgage bankers/brokers insurance for Plaintiff. (*Id.* at 1-3.) HUB obtained a policy from Defendants Underwriters at Lloyd's, London ("Underwriters"), which are "not an insurer, but a marketplace where various underwriters agree to underwrite

portions of a particular risk." (Doc. 34 at 4 n.1; Doc. 23 at 1, 3.) That initial policy, which had an effective date of May 23, 2007, was renewed on June 25, 2008, with a "Certificate Period" covering June 22, 2008, through June 22, 2009. (Doc. 23 at 3; Doc. 33-1 at 5.) Under Insuring Agreement 11.1 of the renewed policy ("Policy"), Underwriters "undert[ook] and agree[d] to indemnify the Insured" for:

> Insuring Agreement (11) – Mortgage Errors and Omissions
>
> (11.1) Mortgagee Interest
>
> > Loss to the Insured's mortgagee interest in real property or to an Investor's interest in real property on whose behalf the Insured is servicing a mortgage, which loss is *discovered by the Insured during the Certificate Period*, provided that such loss is a direct result of an error or negligent omission on the part of the Insured or its Designated Agent in failing to obtain or maintain
> >
> > (i) Fire and Extended Coverage insurance, or
> >
> > (ii) Homeowner's Insurance, or
> >
> > (iii) Mortgage Redemption Life insurance, Accident and Health insurance, or Accidental Death and Dismemberment insurance, or
> >
> > (iv) Flood insurance covering real property located in special flood hazard areas (where flood insurance has been made available under the provisions of the National Flood Insurance Reform Act of 1994 and any amendments thereto)
> >
> > if, by reason of such error or negligent omission, at the time of the loss there is no such insurance in force or such insurance in force is inadequate as to amount or such insurance in force fails to contain a mortgagee clause.
> >
> > Mortgagee Interest is further extended to include ownership interest in real property obtained through foreclosure or by receipt of deed in lieu of foreclosure but in respect of (i), (ii) and (iv) above.

(Doc. 33-1 at 17-18 (emphasis added).) Pursuant to Insuring Agreement 11.6(ii), Underwriters also undertook to indemnify Plaintiff for:

> (11.6) Insurance Requirement Errors and Omissions
>
> . . .
>
> > (ii) Loss to the Insured's Mortgagee interest or Owner interest, including when acting as a mortgage servicing agent or in a legal fiduciary capacity, in real property, which loss was *discovered by the Insured during the Certificate Period* by reason of physical loss or damage to said real property directly caused by those perils covered under Fire

       and Extended Coverage Insurance or Flood Insurance in such amount as is required to be insured by the mortgagor to comply with the National Flood Insurance Reform Act of 1994 or any amendments thereto, provided that such loss to the Insured's interest is a direct result of

    (a)  the non-existence or inadequacy as to amount of such insurance[.]

(*Id.* at 20 (emphasis added).)  At oral argument, counsel for Plaintiff characterized Insuring Agreements 11.1 and 11.6(ii), both of which provide first-party coverage, as functionally identical for the purposes of this Motion.  Counsel for Underwriters did not disagree with this assessment.

  Two further provisions of the Policy are relevant to this dispute.  The first, contained in Condition 5-7, concerns notice to Underwriters:

  (7)  Notice/Proof – Legal Proceedings Against Underwriter

    Condition applicable to Parts A and B of this Certificate

    (i)  At the earliest practicable moment, not to exceed 60 days, after discovery of loss, the Insured shall give the Underwriters notice thereof.

    . . .

    (vii)  Special Condition Applicable to 1 – INSURING AGREEMENTS (11) (11.1):

    It is agreed that, as a condition precedent to the rights to recover under 1 – INSURING AGREEMENTS (11) (11.1), the Insured shall give written notice of the discovery of the loss at the earliest practicable moment and in no event later than sixty (60) days after discovery. The written notice shall provide full particulars including the identity of the person(s) responsible for the loss, the circumstances surrounding the loss, the amount of the loss and any other information which the Insured may so possess.

    (viii)  Special Condition Applicable to 1 – INSURING AGREEMENTS (11)(11.2), (11.3), (11.4), (11.5), (11.6) and (12):

    It is agreed that, as a condition precedent to its right to recover under 1 – INSURING AGREEMENTS (11)(11.2), (11.3), (11.4), (11.5), (11.6) and (12) of this Certificate, the Insured shall give written notice of any Claim made against the Insured at the earliest practicable moment but in no event later than sixty (60) days following the date such Claim is made. The written notice shall provide full particulars including the identity of the persons bringing the Claim, the identity of the person(s) responsible for the loss, the

>circumstances surrounding the loss, the amount of the loss and any other information which the Insured may so possess.
>
>If during the Certificate Period the Insured becomes first aware of any error or negligent omission under 1 – INSURING AGREEMENTS (11)(11.1), (11.2), (11.3), (11.4), (11.5) or (11.6) before any Claim is made against the Insured but which could be reasonably anticipated to result in a Claim against the Insured, then the Insured shall give written notice at the earliest practicable moment but in no event later than sixty (60) days following the date the Insured becomes first aware of such error or negligent omission. . . .

(*Id.* at 41-42.)  The second relevant provision, Condition 5-7(iv) of the Policy, reads as follows:

>Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriters or after the expiration of 24 months from the discovery of such loss.

(*Id.* at 41.)

In April 2006, the Fund made a loan to Avocet Oceanfront Villas, LP for development of a 146-acre property ("Property") in Galveston County, Texas. (Doc. 23 at 4.)  Avocet's insurance on the Property lapsed in December 2007, and on April 8, 2008, the Fund foreclosed on the Property after Avocet defaulted on its loan. (*Id.*)  As the Fund's manager, Plaintiff assumed responsibility for managing and purchasing insurance for the Property, which is located in an area subject to the National Flood Insurance Reform Act of 1994. (*Id.*)  Plaintiff failed to purchase fire and extended coverage insurance or flood insurance for the Property, and on September 13, 2008, the Property was badly damaged by Hurricane Ike. (*Id.*)  Plaintiff became aware of the damage by March 2009—i.e., during the Policy's Certificate Period—and asked HUB whether losses to the Property were covered by any of Plaintiff's insurance policies. (*Id.* at 4-5.)  HUB informed Plaintiff that they were not. (*Id.* at 5.)

For the first time in its Response, Plaintiff alleges that in June 2010, "the Fund became a corporation and purchased Plaintiff as a wholly owned subsidiary." (Doc. 34 at 4.)  Around the same time, the Fund purchased an omissions policy ("Fund Policy") from a number of underwriters of Lloyd's, London—"[s]ome, but not all, of [whom]

- 4 -

underwrote Plaintiff's policy"—that listed Plaintiff as an additional insured. (*Id.* & n.1.) Based on the Fund Policy, the Fund submitted a claim to its own underwriters, seeking compensation for Plaintiff's failure to obtain insurance on the Property. (*Id.*) The Fund's underwriters initially indicated to the Fund that the Fund Policy "potentially could afford coverage for this matter." (*Id.*) But when payment was not forthcoming after two years, the Fund sued to recover on the Fund Policy. (*Id.*) The court—it is not clear from the Response in which court the action was brought—"ultimately granted summary judgment to the Fund's underwriters on the ground that Plaintiff . . . discovered the loss before the policy period." (*Id.* at 4-5.)

On December 20, 2013, Plaintiff notified Underwriters' counsel in a separate action that it was seeking recovery under the Policy for its negligent failure to obtain the necessary insurance on the Property. (Doc. 23 at 6.) At counsel's request, Plaintiff sent notice to Underwriters' official London address on January 17, 2014; three months later, on March 28, 2014, Underwriters informed Plaintiff that they were denying coverage. (*Id.*) It is not clear under which Insuring Agreement Plaintiff filed its claim, but at oral argument Plaintiff's counsel expressed his view that both 11.1 and 11.6(ii) provide coverage.

Plaintiff brought this action on September 10, 2014. (Doc. 1.) The First Amended Complaint, filed December 11, 2014, requests actual, consequential, statutory, incidental and punitive damages from Underwriters and HUB on eight causes of action, including breach of contract, breach of the duty of good faith and fair dealing, negligence, and professional negligence. (Doc. 23 at 7-11.) Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Motion seeks dismissal of Plaintiff's First Amended Complaint as to Underwriters on the grounds that (1) Plaintiff failed to provide Underwriters notice of its claim within sixty days of discovering its loss, as required by the Policy, and (2) Plaintiff did not file this action within the contractual two-year limitations period.

## II. LEGAL STANDARD

Dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint need include "only enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On such a motion, all allegations of material fact are assumed to be true and are construed in the light most favorable to the non-moving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). To show that the plaintiff is entitled to relief, the complaint must permit the court to infer more than the mere possibility of misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the plaintiff's pleadings fall short of this standard, dismissal is appropriate.

## III. ANALYSIS

### A. The Notice-Prejudice Rule Applies to This Coverage

The parties agree that Plaintiff discovered the damage to the Property within the Certificate Period (the policy period) and notified Underwriters of its claim beyond the Certificate Period and more than sixty days after discovering the loss. Nevertheless, Plaintiff contends that under governing Arizona insurance law, it is excused from the sixty-day notice requirement unless Underwriters were prejudiced by the delay. Underwriters respond that the Policy is a "claims-made" policy and therefore not subject to the "notice-prejudice" rule. Some background on Arizona insurance law is helpful.

Arizona law generally distinguishes between occurrence and claims-made insurance:

> An 'occurrence' policy of professional liability insurance covers an act or omission that occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted. This type of policy requires that notice be given to the insurer 'within a specified time after the insured event.' Because injuries from professional malpractice claims may not manifest themselves for years after the occurrence policy has expired,

> however, an exposure time, or a 'tail,' is created. A tail is the time lapse between the date of the negligent act or omission and the time when a claim is made.
>
> [O]ccurrence policies with a 'tail' that extends beyond the policy period are historically associated with certain difficulties. One problem with occurrence policies is that the insurer cannot calculate the premium for the risk with any certainty. The insurer must compute premiums for occurrence professional liability policies at current rates while claims must be resolved at market rates, sometimes long after the premiums have been paid. Another difficulty with occurrence policies is that when professional negligence continues over a period of time, and an insured changes from one occurrence carrier to another, uncertainty exists about which insurer will provide coverage.

*Thoracic Cardiovascular Assocs. v. St. Paul Fire & Marine Ins. Co.*, 181 Ariz. 449, 452, 891 P.2d 916, 919 (Ct. App. 1994) (citations omitted). Given these difficulties, insurers have largely shifted to "claims-made" policies, which allow insurers to "underwrite a risk and calculate premiums with greater certainty." *Id.* at 453, 891 P.2d at 920.

> The 'claims made' policy differs from an 'occurrence' policy in several important aspects. Because it triggers coverage, transmittal of the notice of the claim to the insurer is the most important aspect of the claims made policy. A claims made policy extends coverage if the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term. The timing of the making of the claim in such policies stands in equal importance with the error or omission as the insured event. Notice to the insurer of a claim made against the insured is generally required to be given during the policy period or within a specified amount of time after the policy period. The essence, then, of a claims-made policy is *notice to the carrier within the policy period*.

*Id.* (emphasis in original) (citations and internal quotation marks omitted).

One may sometimes obtain through claims-made insurance the same effective coverage available under occurrence policies, by renewing the claims-made policy over time. When one chooses to have no coverage for future occurrences or ceases doing business, so that no future acts could give rise to liability, one can often buy extended reporting coverage, even indefinite extended reporting. Over the long run, the difference between the two kinds of insurance is in the pricing and how long the insured must carry

it. The insurer obtains additional premiums for extended coverage, priced as the insurer then sees fit. In occurrence policies, the insured pays the premium at the beginning and does not pay again for extended reporting coverage. In claims-made policies, the time for reporting the claim defines the risk the insurer undertakes for the premium for that period. That risk may be renewed and re-priced over time.

The two kinds of policies also differ in the defenses an insurer may raise. With respect to occurrence policies, "an insurance company is not relieved of its contractual liability because of the insured's failure to give notice unless it can show that it has been prejudiced thereby." *Lindus v. N. Ins. Co.*, 103 Ariz. 160, 164, 438 P.2d 311, 315 (1968). "Insurance policies are invariably prepared by the insurer," the Arizona Supreme Court has explained, "and are therefore construed most strongly against it, and especially so when an alleged forfeiture for failure on the part of the insured to perform a condition subsequent is concerned." *Watson v. Ocean Accident & Guar. Corp.*, 28 Ariz. 573, 579, 238 P. 338, 340 (1925). Requiring the insurer to show prejudice is appropriate because "the failure to make proof in the time required thereby merely postpones the time of bringing suit." *Id.* For occurrence policies, "the burden of proving prejudice is on the insurance company." *Lindus*, 103 Ariz. at 164, 438 P.2d at 315. The notice-prejudice rule applies to occurrence policies even when those policies contain "express policy provision[s] providing a specific penalty for failure to give such notice." *Md. Cas. Co. v. Clements*, 15 Ariz. App. 216, 222, 487 P.2d 437, 443 (Ct. App. 1971).

But the notice-prejudice dispensation for late notice does not apply in claims-made insurance because the role of notice to the insurer is fundamentally different in the two types of policies:

> If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an *extension of coverage* to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties. This we cannot and will not do.

*Sletten v. St. Paul Fire & Marine Ins. Co.*, 161 Ariz. 595, 597, 780 P.2d 428, 430 (Ct. App. 1989) (quoting *Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So. 2d 512, 515-16 (Fla. 1983)) (italics in *Sletten* and *Dolan*). The effect of this extension of coverage, the *Sletten* court explained, "would be to convert claims-made policies into occurrence policies. In the absence of actual prejudice from late reporting, which also defeats coverage under an occurrence policy, all negligence during the policy period would be covered." *Id.*; *accord Thoracic*, 181 Ariz. at 454-55, 891 P.2d at 921-22.

Plaintiff's Policy is not an occurrence policy, as it does not extend coverage to all acts or omissions that occur during the policy period. But neither is it a claims-made policy. "Notice to the insurer of a claim made against the insured" defines a claims-made policy and the risk an insurer undertakes. *Thoracic*, 181 Ariz. at 453, 891 P.2d at 920. Coverage under the Policy turns on discovery within the policy period of a loss to real property for which Plaintiff negligently failed to obtain insurance, not on when Plaintiff's loss is reported to the insurer. The risk is limited by when the insured discovered the loss—which is similar to, but not exactly the same as, limiting the risk to what is reported to the insurer within the policy period. Like a claims-made policy, the Policy has a defining, strict measure of coverage, which cannot be extended by lack of prejudice. But the measure is discovery, not reporting, and that measure was satisfied here.

If one wanted a label for this kind of policy, it is hard to think of a better word than "discovery" policy. Unfortunately, some cases, including Arizona cases, have already applied that label to a different kind of policy, a subset of claims-made policies.[1]

---

[1] The *Sletten* court labeled "persuasive" the following statement about some claims-made policies from the Florida Supreme Court's *Dolan* opinion: "Coverage depends on the claim being made and reported to the insurer during the policy period. Claims-made or discovery policies are essentially *reporting* policies." 161 Ariz. at 597, 780 P.2d at 430 (emphasis in *Dolan* and *Sletten*). "In a discovery policy," the Court of Appeals has explained, "the coverage is effective if the negligent or omitted act is discovered and *brought to the attention of the insurance company during the period of the policy*, no matter when the act occurred." *Mission Ins. Co. v. Nethers*, 119 Ariz. 405, 407, 581 P.2d 250, 252 (Ct. App. 1978) (emphasis added) (citing *Samuel N. Zarpas, Inc. v. Morrow*, 215 F. Supp. 887 (D.N.J. 1963)). Whatever those courts mean by this usage, the category plainly requires reporting the claim, not just discovering it, within the policy period. So this Policy is not a "discovery" policy within that usage.

To try now to reclaim that label for policies like Plaintiff's would only add to the confusion caused by courts that use "discovery policy" to require something more than discovery during the policy period. But arbitrary labels do not matter in the law. The Policy defines its risk by when the insured discovers the loss, not by when he reports it. Discovery by the insured, not notice to the insurer, is the event that cannot be extended beyond the policy period, regardless of lack of prejudice. Underwriters' effort to label this a claims-made policy, and thereby bar consideration of prejudice, strains the language of the Policy.

Other portions of the Policy confirm that the coverage in Insuring Agreements 11.1 and 11.6(ii) is not claims-made. The Professional Indemnity section, which the parties struck out, limited coverage to claims "first made against the Insured or Insured Person during the Certificate Period or an Extended Reporting Period and reported to Underwriters within the time period specified by the Certificate." (Doc. 33-1 at 22.) This is typical claims-made language. The text of the Professional Indemnity provision shows that Underwriters knew how to write claims-made insurance when they wanted to. But Insuring Agreements 11.1 and 11.6(ii) conspicuously left out any reference to reporting the claim within the Certificate Period.

The requirement that Plaintiff provide notice at the earliest practicable moment, and in no event later than sixty days after discovery, does not measure the risk Underwriters assumed in the Insuring Agreements, as reporting requirements in claims-made policies do. Rather, like reporting requirements in occurrence policies, the sixty-day rule is meant to assist in processing claims. This purpose is evident from the rule's placement among other promises in aid of processing, such as Conditions 5-7(ii) and 5-7(iii), which relate to furnishing proper proof of loss. (*See id.* at 41.) Indeed, in addition to mandating notice within sixty days, Conditions 5-7(vii) and 5-7(viii) also describe the information that any notice of loss must contain. Breach of such promises without harm to the insurer does not justify denying coverage. *See Clements*, 15 Ariz. App. at 222, 487 P.2d at 443 (holding that "the alleged untimely filing by plaintiffs of the proofs of loss

does not operate to release [the insurer] from liability under its policy" absent "evidence that the failure to make a timely showing of loss was prejudicial to the insurer"). The description of sixty-day notice as a "condition precedent" does not alter this conclusion. *See Lindus*, 103 Ariz. at 164-65, 438 P.2d at 315-16 (applying notice-prejudice rule where "notice [was] made an express condition precedent to liability under the policies").

The language of the Policy is clear enough, and it does not write claims-made insurance or otherwise exclude the notice-prejudice rule. This is so even without recourse to the rule of ambiguity in insurance policies. But if the Policy were ambiguous, Plaintiff would prevail under that rule as well. When a provision in an insurance contract "appears ambiguous, we interpret it by looking to legislative goals, social policy, and the transaction as a whole. We construe the clause against the insurer, however, if ambiguity remains after we apply those interpretive guides." *Wilshire Ins. Co. v. S.A.*, 224 Ariz. 97, 99, 227 P.3d 504, 506 (Ct. App. 2010) (citation and internal quotation marks omitted).

Underwriters will have an opportunity after discovery to show that they were prejudiced by Plaintiff's late notice. For now, however, Plaintiff's First Amended Complaint states a claim upon which relief can be granted.

**B.  The 24-Month Contractual Limitations Period Is Also Subject to the Prejudice Rule for Lateness**

Underwriters argue this action is untimely under Condition 7(iv) of the Policy, which prohibits bringing legal proceedings to recover a loss "after the expiration of 24 months from the discovery of such loss." Underwriters ground this contention in Arizona Revised Statutes § 20-1115(A)(3), which prohibits policy terms:

> Limiting the time within which an action may be brought to a period of less than two years from the time the cause of action accrues in connection with all insurances other than property and marine and transportation insurances. In property and marine and transportation policies such time shall be one year from the date of occurrence of the event resulting in the loss except that an insurer may extend such limitation beyond one year in its policy provisions.

- 11 -

The coverage for loss "to the Insured's mortgagee interest in real property or to an Investor's interest in real property on whose behalf the Insured is servicing a mortgage" may be a "property policy" within the meaning of § 20-1115(A)(3). *See Adams v. N. Ins. Co.*, 16 Ariz. App. 337, 339, 493 P.2d 504, 506 (Ct. App. 1972) (holding that plaintiff's policy was a "property policy" where her "complaint allege[d] that she ha[d] 'sustained a property loss'" and she was "suing under the property loss portion of the policy"). Although the Policy also insures for other kinds of losses as well, a "policy purporting to be entire may be divisible and severable where it covers several different kinds of risks." *Id.* (citation omitted). Therefore, Plaintiff's action may be governed by the second, not the first, sentence of § 20-1115(A)(3), and the limitations period may run "from the date of occurrence of the event resulting in the loss," rather than from the date on which Plaintiff's causes of action accrued.

Either way, a contractually agreed limitations period permitted by § 20-1115(A)(3) is not absolute. An "insurer may be estopped from raising a defense based upon such an adhesive clause where the enforcement of the clause would work an unjust forfeiture. The key factor in the determination of this issue is the question of whether the insurer has shown prejudice by reason of the delay in filing suit." *Zuckerman v. Transamerica Ins. Co.*, 133 Ariz. 139, 146, 650 P.2d 441, 448 (1982). Often in the modern insurance industry, a policy's "limitation clause, notice of loss clause, proof of loss clause, together with the cooperation clause, are all adhesive in nature and are the result of neither choice nor negotiation." *Id.* Where these "conditions do no more than provide a trap for the unwary, the insurer will be estopped to raise them. We thereby grant the consumer his reasonable expectation that coverage will not be defeated by the existence of provisions which were not negotiated and in the ordinary case are unknown to the insured." *Id.* But this principle is "applicable only to those situations in which the terms and conditions of the policy have not been truly negotiated by the parties. In those insurance agreements in which the parties have bargained or had the opportunity to

bargain for the entire contract, ordinary rules of contractual construction should continue to be applied." *Id.*

Underwriters' limitations defense therefore turns on the extent to which the Policy was negotiated at arms' length and whether Underwriters would suffer prejudice from the late claim. These matters do not appear on the face of the First Amended Complaint. They cannot prevent the First Amended Complaint from stating a claim upon which relief can be granted.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss First Amended Complaint (Doc. 32) is denied.

Dated this 9th day of April, 2015.

_____
Neil V. Wake
United States District Judge