**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| 11333 Incorporated, | No. CV-14-02001-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Certain Underwriters at Lloyd's, London, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

I.  FACTUAL BACKGROUND ............................................................................. 1

   A.  The Fund and the Avocet Loan ............................................................. 1

   B.  HUB .......................................................................................................... 3

   C.  The 08-09 E&O Policy's Terms ........................................................... 4

   E.  This Action ............................................................................................... 9

II.  LEGAL STANDARDS ................................................................................... 9

   A.  Summary Judgment ............................................................................... 9

   B.  Breach of Contract............................................................................... 10

   C.  Duty of Good Faith and Fair Dealing............................................... 11

   D.  Negligence ............................................................................................. 12

E.      Exclusion of Expert Witnesses ............................................................... 12

III.   ANALYSIS ............................................................................................... 13

A.      Claims Against Underwriters ............................................................... 13

     1.     Insurance Claims ............................................................................ 13

         a.     Mortgagee or Owner Interest ............................................... 13

         c.     Expiration of Coverage ......................................................... 17

         d.     Prejudice ............................................................................... 18

         e. Covenant of Good Faith and Fair Dealing ........................... 20

     2.     Punitive Damages ........................................................................... 24

B.      Claims Against HUB .......................................................................... 24

     1.     Contract Claims .............................................................................. 24

         a.     Breach of Contract ............................................................... 24

         b.     Breach of Covenant of Good Faith and Fair Dealing ........... 26

     2.     Negligence and Professional Negligence ....................................... 27

         a.     Statute of Limitations ........................................................... 27

         b.     Merits ................................................................................... 29

C.      Motions to Exclude Expert Witnesses ................................................. 29

     1.     John McReynolds ............................................................................ 30

     2.     Chandra Womack ............................................................................ 30

     3.     Nigel Hughes .................................................................................. 31

The plaintiff in this case, 11333 Incorporated ("11333"), seeks damages against defendants Certain Underwriters at Lloyd's, London ("Underwriters") and HUB International Insurance Services, Inc. ("HUB") based on the insurance 11333 believes it had or should have had when Hurricane Ike struck the Texas Gulf Coast in 2008. Before the Court are motions for summary judgment filed by Underwriters (Doc. 109) and HUB (Doc. 113), and a cross-motion for partial summary judgment filed by 11333 (Doc. 142). Also before the Court are four motions to exclude expert testimony. (Docs. 103, 106, 107, 120.) The Court now considers these and all accompanying briefing.[1]

## I. FACTUAL BACKGROUND

The following facts are not in dispute except where otherwise noted.

### A. The Fund and the Avocet Loan

Formerly known as "Investors Mortgage Holdings, Inc.," 11333 is a licensed mortgage broker incorporated in Arizona. (Doc. 110 at 2; Doc. 138 at 2.) The company arranges and services mortgage loans. (Doc. 109 at 5; Doc. 137 at 3.) On May 15, 2003, 11333 was designated as exclusive manager of IMH Secured Loan Fund, LLC ("the Fund"), a limited liability company that makes commercial and subdivision real estate loans. (Doc. 110 at 3; Doc. 138 at 3.) The Fund was owned by roughly 4,000 member investors. (*Id.*) Until 2010, 11333 was a separate entity from the Fund. (*Id.*) (The Fund acquired 11333 as a wholly owned subsidiary in 2010.[2] *See* Doc. 110 at 19; Doc. 138 at 19.) In its capacity as the Fund's manager, 11333

> had responsibility and final authority in almost all matters affecting the Fund's business. These duties include dealings with Members, accounting,

---

[1] The Local Rules of the District of Arizona do not permit supplemental statements of facts with reply briefs. *See* Local Rule LRCiv 56.1. Accordingly, 11333's supplemental statements of facts (Docs. 155, 158) are stricken from the record and not considered here.

[2] In June of 2010, the Fund converted to a corporation called "IMH Financial Corporation" and "acquired all outstanding shares of [11333]." (Doc. 110 at 19; Doc. 138 at 19.) This Order will still refer to IMH Financial Corporation as "the Fund."

tax and legal matters, communications and filings with regulatory agencies and all other needed management and operational duties.

(Doc. 142 at 3 (internal quotation marks omitted).) Loans made by the Fund "were selected for the Fund by 11333 from loans originated by 11333," and the Fund relied on 11333's "performance in obtaining, underwriting, processing, making and brokering loans to [the Fund], and determining the financing arrangements for borrowers." (*Id.*) By 11333's account, when it would originate a loan for the Fund, it would obtain the borrower, process the loan application, and broker the loan to the Fund. (*Id.*) The Fund would then fund the loan when it closed. (*Id.*)

On April 28, 2006, the Fund made an $18 million mortgage loan to Avocet Oceanfront Villas, LP ("Avocet"), a subdivision land developer. (Doc. 110 at 6; Doc. 138 at 5). 11333 contends (though both defendants dispute) it "originated" the loan before the Fund "purchased" it by virtue of making it to Avocet.[3] (Doc. 142 at 7; Doc. 110 at 7.) Avocet used the loan to obtain and develop 146 acres for a subdivision on the Bolivar Peninsula, a strip of oceanfront land in Galveston, Texas ("the Avocet Property"). (Doc. 113 at 4.) Pursuant to its loan agreement, Avocet purchased an insurance policy from Evanston Insurance Company ("the Evanston Policy") covering any buildings on the property, which was only one house used as a sales office. (Doc. 110 at 7; Doc. 138 at 8.) Avocet's Evanston Policy, which did not include coverage for flood or wind damage, listed both the Fund and Investors Mortgage Holdings, Inc. (11333's former name) as "additional insured" parties. (Doc. 114-1 at 101.)

Over the next year Avocet proceeded to clear out lots, pave roads, install sewers and underground electrical wiring, and construct the single house used as a sales office. (Doc. 109 at 6.) In 2007 Avocet stopped paying its premiums on the Evanston Policy, lost its insurance coverage, and defaulted on its mortgage loan. (Doc. 109 at 6.) The

---

[3] 11333 organized the loan for the Fund to make, which is what mortgage brokers do. The preparation and consummation together are usually referred to as "originating" the loan. 11333's private usage, in which only the preparation is "originating" and the lending is "purchase" of the loan rather than making the loan, does not change any facts or legal rights.

- 2 -

Fund foreclosed on April 8, 2008, perhaps through 11333 as its manager. (Doc. 110 at 9; Doc. 138 at 11; Doc. 138-11 at 20.) The Fund then deeded the Avocet Property to a subsidiary called IMH Special Asset NT 139, LLC ("NT 139"), which the Fund had created roughly two weeks before the foreclosure. (Doc. 109 at 6; Doc. 142 at 7.) The Fund would often create distinct subsidiaries to manage specific assets in order to shield the rest of the company from any liability the asset might later produce. (Doc. 111-1 at 93.) NT 139 accordingly assumed and retained ownership of the Avocet Property.

**B. HUB**

At some point in time (it is unclear from the record when), 11333 reached out to HUB, an insurance broker, to obtain insurance for "11333's business operations." (Doc. 143 at 4; Doc. 148 at 2.) Both parties provide a cryptic narrative about how exactly their relationship progressed. From what it seems, the parties first interacted in 2007, when HUB procured for 11333 a "Mortgage Bankers/Brokers Errors and Omissions" policy ("E&O Policy") from Underwriters. (Doc. 111-1; Doc. 113 at 5; Doc. 142 at 4.) The date on which the policy was first purchased is unclear from the record, though likely it was in May of 2007. *See* Doc. 138-11 at 24.

From there the chronology gets murkier yet. By 11333's account, at some unspecified point in time it provided HUB with a copy of the Confidential Private Placement Memorandum, a document given to the Fund's investors describing the Fund's operations and explaining 11333's involvement as the manager. (Doc. 142 at 4; Doc. 143 at 4.) The record, however, reveals that 11333's only evidence that HUB had this document was the assumptions and speculations of a single witness. *See* Doc. 136-1 at 45-47. A close reading of the record does not show any testimony supporting 11333's assertion. But as discussed below, even if there were such evidence, it would not affect the outcome of the present motions.

The E&O Policy was the only coverage HUB ever obtained for 11333. (Doc. 142 at 14.) The policy named 11333 (under its former name) as the principal insured and did not name the Fund or NT 139 as insureds. (Doc. 110 at 13-14; Doc. 138 at 17-18.) The

policy had an initial effective date of May 23, 2007, and extended to May 23, 2008. (Doc. 138-11 at 25.) 11333 signed an application to renew the policy for a one-year period and submitted it to Underwriters on May 27, 2008. (Doc. 113 at 5-6.) The renewed policy (the "08-09 E&O Policy") became effective on June 22, 2008, and remained in effect until June 22, 2009. (Doc. 113 at 5.) The 08-09 E&O Policy is the only policy at issue in this case.

**C. The 08-09 E&O Policy's Terms**

The Mortgage Bankers/Brokers Errors and Omissions Insurance here covers the mortgage broker for diverse losses and liabilities, including employee dishonesty, theft or loss of documents, forged checks and documents, counterfeit currency, fraudulent mortgages, computer crime, computer viruses, at least six types of loss from mortgage errors and omissions, some kinds of theft by principals of the insured, defense expenses for officers and directors, and more. (Doc. 111-1.) At issue in this lawsuit are two types of the mortgage errors and omissions coverage. One is for certain losses resulting from the insured mortgage broker's negligent failure to obtain adequate coverage for "Fire and Extended Coverage insurance" and "Flood insurance." (Doc. 111-1 at 17-18.) The other protects only the insured in limited circumstances and independent of the insured's own negligence. (Doc. 111-1 at 20.)

Some of the diverse coverages in the 08-09 E&O Policy are third-party coverages; that is, they indemnify 11333 for its liability to third parties. But much of the policy is first-party coverage for 11333's own losses, sometimes losses from its own negligence. In examining any coverage, attention must be given to whether it is first-party or third-party coverage or both.

The two coverage clauses at issue here come under a section entitled "Part B Coverage – Extended Indemnity Coverage: Claims Involving Investors, Secondary Market Institutions, etc." (Doc. 111-1 at 17.) Agreement 11.1 reads as follows:

The Underwriters hereby undertake and agree to indemnify the **Insured** for:

. . .

(11.1) Mortgagee Interest

>Loss to the **Insured's** mortgagee interest in real property or to an **Investor's** interest in real property on whose behalf the **Insured** is servicing a mortgage, which loss is discovered by the **Insured** during the **Certificate Period**, provided that such loss is a direct result of an error or negligent omission on the part of the **Insured** or its **Designated Agent** in failing to obtain or maintain

>>(i) Fire and Extended Coverage insurance, or

>>(ii) **Homeowner's Insurance**, or

>>(iii) Mortgage Redemption Life insurance, Accident and Health insurance, or Accidental Death and Dismemberment insurance, or

>>(iv) Flood insurance covering real property located in special flood hazard areas (where flood insurance has been made available under the provisions of the National Flood Insurance Reform Act of 1994 and any amendments thereto)

>if, by reason of such error or negligent omission, at the time of the loss there is no such insurance in force or such insurance in force is inadequate as to amount or such insurance in force fails to contain a mortgagee clause.

>Mortgagee Interest is further extended to include ownership interest in real property obtained through foreclosure or by receipt of deed in lieu of foreclosure but in respect of (i), (ii) and (iv) above.

(Doc. 111-1 at 17-18 (bold in original).) (Words in bold are defined terms in the policy.) This Agreement indemnifies 11333 for its own losses. It also indemnifies 11333 for its liability for losses sustained by "investors" as defined in the policy (i.e., purchasers of the mortgage in the secondary market). 11333 passed up the opportunity to buy more extensive coverage for liability to third parties based on stricken text that would have included "Extended Errors and Omissions Coverage" for "Professional Indemnity."

(Doc. 111-1 at 22.) Additionally, the block in the certificate for that coverage's extra premium is left blank. (Doc. 111-1 at 7.) That coverage would have indemnified 11333 for liability to third parties generally for their losses arising out of 11333's errors or omissions in rendering them professional services.[4] (Doc. 111-1 at 22, 30.)

Agreement 11.6(ii) reads as follows:

> The Underwriters hereby undertake and agree to indemnify the **Insured** for:
>
> . . .
>
> (11.6) Insurance Requirement Errors and Omissions
>
> . . .
>
> > (ii) Loss to the **Insured's** Mortgagee interest or Owner interest, including when acting as a mortgage servicing agent or in a legal fiduciary capacity, in real property, which loss was discovered by the **Insured** during the **Certificate Period** by reason of physical loss or damage to said real property directly caused by those perils covered under Fire and Extended Coverage Insurance or Flood Insurance in such amount as is required to be insured by the mortgagor to comply with the National Flood Insurance Reform Act

---

[4] The deleted text read:

Part C Coverage—Extended Errors and Omissions Coverage

Insuring Agreement (13) – Professional Indemnity

(13.1) Underwriters agree to indemnify the **Insured** and any **Insured Person** for all sums that such entity or person shall become legally obligated to pay as **Damages** and **Defense Expenses** resulting from any **Claim** arising out of any **Professional Indemnity Wrongful Act** taking place on or after the inception date of this Certificate and subsequent to the expiration of the **Certificate Period**, in the **Insured's** rendering of, or failure to render, **Professional Services**, and which **Claim** is first made against the **Insured** or **Insured Person** during the **Certificate Period** or an **Extended Reporting Period** and reported to Underwriters within the time period specified by the Certificate.

(Doc. 111-1 at 21 (bold in original).) The policy elsewhere defines "Professional Indemnity Wrongful Act" to include "breach of duty, neglect, error, misstatement, misleading statement or omission on the part of the **Insured** solely in rendering or failing to render **Professional Services** to others . . . in the ordinary course of the **Principal Insured's** business as a mortgage banker . . . ." (Doc. 111-1 at 30.)

- 6 -

of 1994 or any amendments thereto, provided that such loss to the **Insured's** interest is a direct result of

(a)    the non-existence or inadequacy as to amount of such insurance; or

(b)    the **Insured** is unable to collect the loss, which would have otherwise been covered under the perils provided by the insurance required to be kept in place, wholly or partly, under said insurance, despite reasonable efforts and expenditures to recover said loss.

Coverage under this Insuring Agreement is limited to 90 days from the date an **Employee** with supervisory responsibility in the "In-House" insurance agency, foreclosure unit insurance escrow unit or servicing department of the **Insured** becomes aware that the required insurance is not in effect or is inadequate as to amount or uncollectible.

Special Conditions:

It is agreed that as a condition precedent to coverage under **1 – INSURING AGREEMENTS (11)**(11.6)(ii) above that:

(1)    the **Insured** shall incorporate in every mortgage agreement entered into by the **Insured** on or after inception date of this Certificate a condition requiring the mortgagor to maintain Fire and Extended Coverage insurance and said Flood insurance; and

(2)    as to all prior mortgages existing before the inception date of this Certificate, the **Insured** shall require that the mortgagor shall maintain Fire and extended Coverage Insurance and said Flood insurance for the benefit of the **Insured** . . . .

(Doc. 111-1 at 20-21 (bold in original).)

Agreement 11.6(ii) indemnifies 11333 only for losses to its own mortgagee or owner interests occurring when 11333 does not know, or within 90 days of learning, that the required mortgagor-supplied insurance is lacking or inadequate, not for losses to the interests of others for which 11333 may be liable. Third-party liability coverage partly appears in Agreement 11.1 and was broadly available in the deleted Agreement 13.

Agreement 11.6(ii) is gap coverage for 11333's own losses for a period of time.

**D. The Claim**

On September 13, 2008, Hurricane Ike made landfall on the Bolivar Peninsula, bringing high wind gusts and torrential rain. The parties dispute what damage the storm actually did to the foreclosed Avocet Property. According to 11333, the storm caused damage to the sales office, swept away sewerage manhole covers, ruined vegetation, and damaged "everything else on the Property." (Doc. 142 at 7.) Underwriters, however, dispute what damage can be fairly traced to Hurricane Ike, pointing out that the Avocet Property has incurred damage since the storm, such as copper electrical wiring being stripped by thieves, because no one secured the property to protect it from intruders. (Doc. 109 at 17-18.) The parties agree that 11333 discovered at least some damage by March of 2009 at the latest, within the coverage period of the 08-09 E&O Policy. (Doc. 110 at 11; Doc. 138 at 13.)

Though they do not dispute that 11333, the Fund, and NT 139 all lacked fire and extended coverage or a flood insurance policy that would cover the losses, the parties dispute when 11333 knew that it did not have flood insurance for the physical damage. The evidence shows that on March 26, 2009, six months after the storm, a representative of 11333 emailed HUB asking whether "any coverage was available for [the Avocet] Property on the Texas gulf coast which was damaged in Hurricane Ike . . . ." (Doc. 142 at 8.) A representative of HUB responded that 11333 did not have coverage. (Doc. 113 at 6; Doc. 142 at 8.) HUB did not notify Underwriters of its communication with 11333. (Doc. 142 at 8.) However, according to HUB, 11333 "did not tell Hub that [11333's] failure to obtain Fire and Extended Coverage or flood insurance was the result of [11333's] error or omission, nor did [11333] request that Hub report a claim under the [08-09 E&O Policy]." (Doc. 113 at 6.)

In March of 2011, the Fund, which by then had acquired 11333 (*see* § I(A), *supra*), submitted a claim under a later Mortgage Bankers/Brokers Errors and Omissions Policy, effective from 2010 to 2011, issued by some different and some of the same

underwriters at Lloyd's.[5]  (Doc. 142 at 9; Doc. 143 at 12.)  The Fund took that claim to litigation, for which it lost a summary judgment motion on the grounds that it knew of the loss when it bought the policy at issue there in 2010.  (*Id.*; No. 2:13-cv-01357-SRB, Doc. 71 at 1.)  (The parties in that case later settled while litigating an appeal.)  Then on December 20, 2013, 11333 notified the attorney representing the separate underwriters of the Fund's 2010-2011 policy of its intent to submit a claim of its own under the 08-09 E&O Policy in this case.  (Doc. 142 at 9; Doc. 113 at 6.)  The attorney replied on January 10, 2014, that 11333 must submit a claim through the proper channels as prescribed by the 08-09 E&O Policy.  (Doc. 110 at 22-23; Doc. 138 at 23.)  11333 then submitted a formal claim to Underwriters on January 17, 2014.  (Doc. 110 at 23; Doc. 138 at 24.)  Underwriters denied coverage on March 28, 2014.  (Doc. 110 at 24; Doc. 138 at 24.)

**E.  This Action**

11333 filed this action on September 10, 2014.  (Doc. 1.)  The amended complaint alleges breach of contract and breach of the duty of good faith and fair dealing against Underwriters, as well as negligence, professional negligence, breach of contract, and breach of the duty of good faith and fair dealing against HUB.  (Doc. 23.)  Underwriters and HUB separately seek summary judgment on the claims against each of them, respectively.  11333 seeks summary judgment on its claims against HUB and on whether Underwriters wrongly denied coverage under the 08-09 E&O Policy.

## II.  LEGAL STANDARDS

**A.  Summary Judgment**

Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that affects the outcome of the action under the

---

[5]  The named insured on that 2010-2011 policy is "IMH Financial Corporation [i.e. the Fund] and its wholly owned subsidiaries."  (Doc. 138-3 at 136.)  The policy also lists a "Retroactive Date" of May 23, 2007, the same effective date of 11333's original policy with Underwriters.  (*Id.*; Doc. 111-1 at 5.)  The parties dispute whether the 2010-2011 policy is a renewal of 11333's policy or is wholly separate.  (Doc. 143 at 10; Doc. 145 at 10.)  As discussed below, that dispute is not material to the outcome of this case.

governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. "A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

## B. Breach of Contract

Under Arizona law, an enforceable contract requires "an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Savoca Masonry Co., Inc. v. Homes & Son Const. Co., Inc.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975). The crux of a contract is "the exchange of promises." *Carroll v. Lee*, 148 Ariz. 10, 12, 712 P.2d 923, 925 (1986). "A promise 'may be inferred wholly or partly from conduct.'" *Carroll*, 148 Ariz. at 13, 712 P.2d at 926 (quoting Restatement (Second) of Contracts § 4). "'[T]here is no distinction in the effect of the promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others.'" *Id.* (quoting Restatement (Second) of Contracts § 19). The "ultimate element of contract formation [is] the question whether the parties manifested assent or intent to be bound." *Schade v. Diethrich*, 158 Ariz. 1, 9, 760 P.2d 1050, 1058

(1988). "Decisions on the making, meaning and enforcement of contracts should hinge on the manifest intent of the parties . . . ." *Schade*, 158 Ariz. at 8 n.8, 760 P.2d at 1057 n.8.

A breach of contract action involving a contract for professional services "cannot be maintained if the contract merely requires generally that the professional render services." *Collins v. Miller & Miller, Ltd.*, 189 Ariz. 387, 395, 943 P.2d 747, 755 (Ct. App. 1996). Where a professional relationship exists, "[a] malpractice action may be founded on contract if 'the duty breached is not imposed by law, but is a duty created by the contractual relations and would not exist but for the contract.'" *Desilva v. Baker*, 208 Ariz. 597, 605, 96 P.3d 1084, 1092 (Ct. App. 2004) (quoting *Resolution Trust Corp. v. Western Tech., Inc.*, 179 Ariz. 195, 199, 877 P.2d 294, 298 (Ct. App. 1994)). *See also Barmat v. John & Jane Doe Partners A-D*, 155 Ariz. 519, 524, 747 P.2d 1218, 1223 (1987) ("Absent some special contractual agreement or undertaking between those in the professional relationship, therefore, a professional malpractice action does not 'arise' from contract, but rather from tort.").

A party alleging breach of contract "has the burden of proving the existence of the contract, its breach and the resulting damages." *Thomas v. Montelucia Villas, LLC*, 232 Ariz. 92, 96, 302 P.3d 617, 621 (2013) (internal quotation marks omitted).

## C. Duty of Good Faith and Fair Dealing

Arizona law also recognizes in every contract an implied covenant of good faith and fair dealing. *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). The accompanying duty requires "that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). Bad faith in insurance cases has two elements: "(1) that the insurer acted unreasonably toward its insured, and (2) that the insurer acted knowing that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it." *Miel v. State*

*Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110, 912 P.2d 1333, 1339 (Ct. App. 1995).

### D. Negligence

The tort of negligence generally requires a showing of four elements: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach proximately caused the plaintiff's injury; and (4) resulting damages." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 332, 340 P.3d 405, 411 (Ct. App. 2014).

The first element, that the defendant owed a duty to the plaintiff, hinges on the existence of an "obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Delci v. Gutierrez Trucking Co.*, 229 Ariz. 333, 335, 275 P.3d 632, 634 (Ct. App. 2012) (internal quotation marks omitted). "A person who holds himself out to the public as possessing special knowledge, skill or expertise must perform his activities according to the standard of his profession." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 398, 682 P.2d 388, 403 (1984). One who fails to do this "may be held liable under ordinary tort principles of negligence for the damage he causes by his failure to adhere to the standard." *Id.* Insurance agents in particular must "exercise that degree of care ordinarily to be expected from others in their profession." *Id.*

### E. Exclusion of Expert Witnesses

Rule 702 of the Federal Rules of Evidence governs opinion testimony from qualified experts. Testimony is admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Where the basis for an expert's testimony has been "sufficiently called into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)) (citation omitted). A witness's knowledge of a general professional field may qualify him or her to testify about a specific practice within that field. *See, e.g.*, *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (finding district court did not abuse discretion in permitting expert witness with general qualifications in insurance field to testify specifically about bad faith claims); *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (concluding expert witness's "lack of particularized expertise goes to the weight accorded to her testimony, not to the admissibility of her opinion as an expert").

## III. ANALYSIS

### A. Claims Against Underwriters

#### 1. Insurance Claims

Underwriters first seek summary judgment on 11333's claims against them for breach of contract and breach of the covenant of good faith and fair dealing. Underwriters argue that 11333 did not sustain a loss covered under the 08-09 E&O Policy because (1) 11333 never held a mortgagee interest in the Avocet Property under Agreements 11.1 and 11.6(ii) or an ownership interest under 11.6(ii), (2) 11333 never held an Investor's Interest in the property under Agreement 11.1, (3) coverage under Agreement 11.6(ii) had expired, and (4) 11333 gave late notice of its claim, causing prejudice to Underwriters.

##### a. Mortgagee or Owner Interest

First, 11333 had no Mortgagee interest in the Avocet Property under either Agreement 11.1 or Agreement 11.6(ii). The Fund was the lender and mortgagee, and the Fund took ownership upon foreclosing. Had the Fund been an insured party under the 08-09 E&O Policy, coverage in Agreement 11.1 for not getting Fire or Flood insurance would have extended any mortgage interest to include its ownership interest from foreclosure. *See* Doc. 111-1 at 17 ("Mortgagee Interest is further extended to include ownership interest in real property obtained through foreclosure or by receipt of deed in

lieu of foreclosure but in respect of (i), (ii) and (iv) above."). But the Fund—the only entity to have had a mortgagee interest in the Avocet Property at any time—was not an "Insured" under the 08-09 E&O Policy. Only 11333 was, and 11333 never had a mortgagee interest either before foreclosure or by virtue of foreclosure. Additionally, 11333 never owned any interest in the Avocet Property. It therefore had no "Owner interest" under Agreement 11.6(ii) to which it could have suffered a loss.[6]

11333's arguments to the contrary depend in large part on interpreting the 08-09 E&O Policy as providing third-party coverage with no basis in the language of the policy itself. For instance, 11333 contends it had a "mortgagee interest" or an "owner interest" by virtue of being both the mortgage servicing agent for the Avocet loan and a legal fiduciary as manager of the Fund's assets generally. (Doc. 137 at 9.) 11333 points to the fact that Agreement 11.6(ii) covers "[l]oss to the Insured's Mortgagee interest or Owner interest, *including when acting as a mortgage servicing agent or in a legal fiduciary capacity*, in real property." (Doc. 111-1 at 20 (emphasis added).) 11333 argues it was acting "'in a legal fiduciary capacity' with respect to the [Avocet] Property at the time of Hurricane Ike" by virtue of its Operating Agreement, which "explicitly gave 11333 'fiduciary responsibility for the safekeeping and use of all funds and assets of [the Fund].'" (Doc. 137 at 9.) 11333 also insists it was "acting as a mortgage servicing agent for [the Fund] at the time of Hurricane Ike." (*Id.*)

But the qualifying phrase in Agreement 11.6(ii) on which 11333 hangs its hat just preserves coverage for "[l]oss to the Insured's Mortgagee interest or Owner's interest" from challenge by the insurer because the insured was also acting in a servicing or fiduciary capacity for benefit of others on the same property or mortgage. This ensures

_____

[6] For Agreement 11.6(ii) coverage, there is no parallel extension of a mortgagee's interest to include ownership by virtue of foreclosure. The mortgage was foreclosed on April 8, 2008, extinguishing the mortgage and anyone's interest in it. The 08-09 E&O Policy was made effective as of June 22, 2008, after the foreclosure and when there was no mortgage, only the property ownership interest of NT 139 that the Fund conveyed to it after the Fund foreclosed. At the inception of the 08-09 E&O Policy, there was no mortgage or mortgagee's interest of anyone and no owner interest of 11333 that could bring Agreement 11.6(ii) into play at all.

that 11333's protection for its own interests is not diminished by its additional role concerning the mortgage or property for itself and others. But 11333's status as a fiduciary for the Fund has no relevance to whether 11333 had a mortgagee or ownership interest under the 08-09 E&O Policy's terms.

There was no mortgage or mortgagee at any time after Avocet defaulted and the Fund foreclosed the Avocet Property in April of 2008. Without a mortgage, 11333 could not have been servicing a mortgage or even acting "in a legal fiduciary capacity" concerning a mortgage. 11333's reading of Agreement 11.6(ii) would cut any tether to "the Insured's Mortgagee interest or Owner interest," that the phrase "including when acting . . . as a mortgage serving agent or in a legal fiduciary capacity" modifies. That qualifying phrase would become a primary insuring clause for anyone's mortgagee or owner interest in any property 11333 manages. It would make Underwriters a secondary casualty insurer whether or not 11333's negligence caused the failure of the primary insurance that the mortgagee required from the mortgagor. But Agreement 11.6(ii) is not liability coverage at all because fault is not a requirement.

Rather, Agreement 11.6(ii) coverage is entirely first-party coverage for the protection of the Insured's interests. That contrasts with the adjacent coverage in Agreement 11.6(i), not involved here, which is third-party coverage for 11333's liability to an Investor (buyer of the mortgage in the secondary market) for "[d]irect financial loss sustained by the **Insured** by reason of any **Claim** . . . against the **Insured** . . . by any **Investor** for direct financial loss sustained by such **Investor** as a direct result of an error or negligent omission on the part of the **Insured** . . . and for which it is legally liable in failing to . . . obtain or maintain insurance required by the mortgagee . . . ." (Doc. 111-1 at 20 (bold in original).) Agreement 11.6(ii)'s first-party coverage for 11333's direct losses does not require liability of 11333 to another or any fault of 11333.

It is also helpful to note that under the terms of the policy, Agreement 11.6(ii) would have only come into play if 11333 required the mortgagor to get and maintain requisite Fire and Flood insurance, in which it had to name 11333 as an additional

insured.  If despite that compliance, 11333 had a loss because such insurance did not exist, was insufficient, or was uncollectable, Agreement 11.6(ii) would have covered 11333 for its uninsured or underinsured loss up to 90 days after 11333 learned of the lack or insufficiency of coverage to be provided by the mortgagor.

Agreement 11.6(ii) is very limited and strictly conditional first-party coverage for the insured mortgage broker's own losses.  11333 tries to transform the first-party coverage of Agreement 11.6(ii) for the insured's own losses into first-party casualty insurance for every owner of the property for fire or flood loss not otherwise insured.  It would not even be third-party coverage dependent on 11333's error or negligent omission.  11333's contention is elliptical and unintelligible upon scrutiny.

### b.  Investor's Interest

11333 also had no "Investor's interest" under Agreement 11.1.  No one did. Agreement 11.1 indemnifies 11333 for  "[l]oss to the Insured's mortgagee interest in real property or to an Investor's interest in real property on whose behalf the Insured is servicing a mortgage . . . provided that such loss is a direct result of an error or negligent omission" in failing to obtain insurance coverage.  (Doc. 111-1 at 17.)  The 08-09 E&O Policy defines "investor" as

> a corporation, association, partnership or natural person purchasing **Real Estate Loans** sold or originated by the **Insured** and including but not limited to life insurance companies, pension funds, commercial banks, savings banks, savings and loan associations, state housing finance agencies, mortgage bankers and any **Secondary Market Institutions**.

(Doc. 111-1 at 28 (bold in the original).)  Agreement 11.1 would have indemnified 11333 for its liability for losses to a buyer of the mortgage on the secondary market caused by 11333's own negligent failure to obtain insurance.  It provided a limited window of third-party coverage on three conditions: (1) the existence of an Investor (2) for whom 11333 was servicing a mortgage (3) when a loss to the Investor's interest occurred due to 11333's error or negligent failure to obtain insurance.

But the key here is that this coverage protects 11333 for liability to an "investor," someone "purchasing Real Estate Loans sold or originated by [11333]." (Doc. 111-1 at 29.) 11333 "originated" the loan, but no one purchased the Avocet loan, which means there was no "investor" as defined in the policy. The Fund was not an Investor. It made the loan to Avocet, foreclosed on the property, and deeded it to NT 139.[7] There is no sense in which the Fund "purchased" its own loan from itself or anybody else. "Purchasing" is a simple term essentially synonymous with "buying." *See* Doc. 156 at 6 n.12; *see also Purchase*, Black's Law Dictionary (8th ed. 1999) (defining "purchase" as "[t]he act or an instance of buying"). Moreover, the Fund's role was a far cry from the 08-09 E&O Policy definition of investors in the secondary market. *See* Doc. 109 at 14. There was simply no "investor" in the defined sense involved here, so there was no loss to any investor's interest under Agreement 11.6(ii).

### c. Expiration of Coverage

Underwriters next argue that coverage is independently barred under Agreement 11.6(ii) because that provision only covered losses occurring within 90 days after discovering they were without other insurance. (Doc. 109 at 15.) The relevant provision of Agreement 11.6 reads:

> Coverage under this Insuring Agreement is limited to 90 days from the date an **Employee** with supervisory responsibility in the "In-House" insurance agency, foreclosure unit insurance escrow unit or servicing department of the **Insured** becomes aware that the required insurance is not in effect or is inadequate as to amount or uncollectible.

(Doc. 111-1 at 20 (bold in the original).) Because the issue is complex and summary judgment is otherwise clear, the Court need not decide whether the loss was more than

---

[7] In their reply brief on their own summary judgment motion, Underwriters argue that NT 139 was not an "investor" under the 08-09 E&O Policy. (Doc. 156 at 6-7.) The Fund deeded the Avocet Property to NT 139 after foreclosure and extinguishment of the mortgage. Neither the Fund nor NT 139 was an insured. Since neither party asserts that NT 139 purchased a real estate loan from anyone, it is undisputed that NT 139 is not an investor.

ninety days after 11333 had notice of the lack of coverage.

### d. Prejudice

Underwriters next argue that coverage was rightly denied because 11333 failed to provide notice of its loss within sixty days of discovering it as the policy required. (Doc. 109 at 16-17.) For a claims-made policy, delay alone would extinguish the coverage as a matter of law and without more. But this aspect of the coverage in the 08-09 E&O Policy is occurrence-based, so the coverage continues unless the delay in notice prejudiced the insurer. (Doc. 43 at 10.)

Underwriters argue that they were indeed prejudiced by 11333's late notice, contending that 11333 made no effort to protect the property or otherwise mitigate damage and that over time the abandoned property sustained additional deterioration and damage (such as the theft of metal wiring). Underwriters contend it is not ascertainable what damage was caused by Hurricane Ike and what damage occurred later. (Doc. 109 at 17-20.) 11333 acknowledges its notice was untimely but contends that Underwriters have presented no evidence they were prejudiced. (Doc. 137 at 12-13.) Also, 11333 contends Underwriters could have consulted contemporaneous documentation of the damage produced by third parties and have not shown they themselves would have investigated the Avocet Property earlier with timely notice. (*Id.* at 13-15.)

Underwriters have shown some evidence from which prejudice can be inferred. The delay from March of 2009, the latest date 11333 might have learned it lacked other insurance, to December 2013, the first date it may have given notice to Underwriters, is lengthy and unexcused. After so much time and in the specific circumstances of this casualty and type of property, one simply cannot say without other evidence what damage the hurricane caused and what deterioration and damage occurred over the next five years of neglect. A delay so egregious and these specific circumstances support an inference of increasing damage over time. This is a matter of natural inferential force of primary facts, which may include long delay as one circumstance among others. The rule for occurrence-based insurance is that delay alone does not as a matter of law end the

coverage. The rule does not go further and abolish the natural inferential force of any fact, including a component of delay.

However, summary judgment on this issue is precluded by evidence that one or more investigations and reports made closer in time are available for Underwriters to review. *See* Doc. 138 at 25-26. Those investigations and reports may prove inadequate for Underwriters' legitimate needs for investigation, but that cannot be sorted out on summary judgment. A jury would have to assess their weight.

11333's additional contention that Underwriters would not have investigated a timely claim, thus mooting any actual prejudice from the late notice, has no evidentiary basis. Underwriters did not promptly investigate the claim when first notified because they reasonably but mistakenly thought they had a claims-made policy that expired five years before and they did not need to show specific prejudice. *See* Doc. 43 at 10. That in no way suggests that Underwriters do not investigate their casualty claims in general. Nor does it suggest that a carrier must prove that it follows the normal course of business of investigating its casualty claims before it can assert prejudice in a late notice case.

The case 11333 relies on for its contention that Underwriters would not have investigated a timely claim does not change the analysis. In *Liberty Mut. Fire Ins. Co. v. Mandile*, 192 Ariz. 216, 222, 963 P.2d 295, 301 (Ct. App. 1997), an insured made an underinsured motorist (UIM) claim against his own carrier promptly after settling with the liable driver's carrier for the policy limits—a precondition to UIM coverage. That was eight years after the accident and after the injured child's brain injury stabilized. *Mandile*, 192 Ariz. at 224, 963 P.2d at 303. Before then the insured could make no UIM claim.

First party automobile insurers do not investigate possible UIM liability upon notice of an accident, as they have no need to until the other driver's policy limits have been paid and the UIM claim is made. Nevertheless, the insurer in *Mandile* contested UIM coverage on the fatuous ground that it was prejudiced by not being able to investigate the UIM issues promptly after the accident, though the other driver admitted

liability and the damages did not stabilize for years. *Mandile*, 192 Ariz. at 222-23, 963 P.2d at 301-02. It was also beyond industry practice and pointless, though the court did not remark on that. The appellate court sensibly rejected that contention because the carrier did not show that, contrary to industry practice and common sense, it would have investigated the claim at that early time if a claim had been made then. *Mandile*, 192 Ariz. at 224, 963 P.2d at 303. In contrast, for the kind of coverage at issue here, industry practice, self-interest, and duty to the insured all dictate prompt investigation after notice of the loss.

In the end, summary judgment cannot be granted on the contention of lack of prejudice from late notice because independent records existed documenting the state of the property immediately after the storm. Underwriters had sufficient independent grounds to deny the claim even if prejudice was not proven.

### e. Covenant of Good Faith and Fair Dealing

Underwriters additionally seek summary judgment on 11333's claim that they breached the implied covenant of good faith and fair dealing in their handling of the claim. This claim fails as a matter of law, as the covenant was never breached. There is no evidence that Underwriters' claims handling was unreasonable or that Underwriters knew their actions were unreasonable. Nor is there any evidence that any of the challenged actions or inactions prejudiced 11333 as the insured. 11333 tries here to conjure bad faith liability out of (1) routine and reasonable acts, some of which 11333's own expert witness says were proper individually and (2) irrelevant processing violations said to have happened in the Fund's earlier action on its 2010-2011 policy against a largely different group of underwriters (3) before 11333 even made a claim in this case, (4) none of which prejudiced 11333 in this case.

11333 lists several specific assertions of bad faith in its Response (Doc. 137 at 16-17) to Underwriters' motion for summary judgment. 11333 asserts all of the following:

### i. Underwriters hired outside counsel to "protect their interest."

This could not possibly be bad faith, as 11333's expert admits. It is not insurance bad faith to hire a lawyer.

### ii. Underwriters "fail[ed] to conduct a factual investigation about the Avocet loss."

Underwriters did not investigate more after it found a reasonable ground for denying coverage that they thought meritorious. (Doc. 43 at 17.) The 08-09 E&O Policy has both claims-made and occurrence-type coverages and requirements, and this Court previously determined that neither side got them right. *See* Doc. 43. It was not bad faith for Underwriters to rely on their reasonable though mistaken view of the policy to deny coverage and cease investigation, especially when 11333's position was also mistaken in part.

Moreover, the stopping points of Underwriters' investigation in no way prejudiced 11333. There turned out to be nothing of merit, in fact or in the policy, that could have gotten 11333 to coverage. The multiple policy terms found dispositive in this order needed little investigation. Other issues that are more fact-intensive are lagniappe in light of those dispositive terms. 11333 loses no matter how those other issues turn out. This is not a case in which a denial is "fairly debatable" because the insurer has not investigated other matters that could avoid otherwise certain grounds for denial. Notably, 11333 never says what further investigation might have yielded that could change the outcome in this case. In these circumstances, Underwriters' investigation was reasonable beyond the ability of any rational trier of fact to find otherwise.

### iii. "Failing to check for coverage under earlier policies after receiving notice of the Avocet loss."

The Fund acquired 11333 in 2010, then purchased for itself and its wholly owned subsidiaries a later policy from a largely different set of underwriters for the 2010-2011 year, and in 2013 sued on the 2010-2011 policy for the loss to the Avocet Property.

Rather than presenting a claim to Underwriters in the manner required by the 08-09 E&O Policy, in December 2013, the attorney for the Fund in the 2013 litigation of the 2010-2011 policy, perhaps also representing 11333 (though it was not a party), attempted to present an 08-09 E&O Policy claim informally to the attorney for the other syndicates involved in the 2013 case against the Fund. (Doc. 110 at 22-23; Doc. 138 at 23.) It could not be bad faith for Underwriters not to give up the 08-09 E&O Policy's notice and proof of claim requirements. 11333 then submitted the claim three days later, which 11333 does not say was prejudicial and which no rational trier of fact could find prejudicial in any circumstance, especially after 11333's own five-year delay in submitting its claim. The "time and expense to tender the claim" is required of 11333 by the policy, not an extra burden caused by bad faith. 11333's expert witness conceded that was within Underwriters' rights.

Moreover, 11333 tries to taint the Underwriters on 11333's 08-09 E&O Policy with supposed bad faith from the Fund's earlier lawsuit on the 2010-2011 policy against largely different underwriters. All of that occurred in litigation between different parties before 11333 made its claim and triggered any duty about processing this claim. Of course, 11333 could have made its claim against Underwriters five years earlier, but it did not. The 2010-2011 policy underwriters' previous actions and inactions could not create a duty of the 2008-2009 Underwriters to search for liability on their own policy that 11333 did not think enough of to assert.

iv.    **"Investigating unrelated lawsuits against [the Fund] for a basis to rescind the 10-11 Policy and deny coverage"**

The 2010-2011 policy held by the Fund is not at issue in this litigation, nor is the Fund a party to this case. 11333 cannot hold Underwriters liable for alleged misdeeds against a non-party to this case. What's more, an insurer has every right to investigate its own possible defenses, and there was nothing prejudicial to the Fund, in theory or in fact, in it doing so. There is no authority that this is bad faith, and it is not.

### v. "Waiting three weeks after learning of 11333's claim on December 20, 2013, then rejecting the tender" instead of forwarding it to the correct recipients

The allegation here is that when the Fund's lawyer litigating the 2010-2011 policy tried submitting a claim under the 08-09 E&O Policy to the wrong group of underwriters on 11333's behalf, the lawyer for that group of underwriters took three weeks and rejected the claim instead of forwarding it on to the correct parties. For that lawyer for the other consortium to take three weeks (over the December holiday season) to decline the request to waive policy requirements was utterly prompt. It was not bad faith to require 11333 to go through the proper channels for making a claim.

### vi. "Maintaining no evidence of any independent analysis, investigation, internal coverage discussion, review of [an attorney's] coverage advice, or supervisory review by Underwriters"

11333 says Underwriters did not maintain an exhaustive level of internal records of its processing and that is bad faith. (Doc. 137. at 16.) Again, there is no authority that this is bad faith. Nor can 11333 point to any way in which it was prejudiced by a lesser quantum of records. The records maintained are more than enough to dispose of this case.

### vii. "Delaying a coverage decision under the 08-09 [E&O] Policy for over three months after learning of 11333's claim"

Underwriters denied 11333's claim 70 days after receiving it. Underwriters retained coverage counsel who gave a coverage opinion and prepared a nine-page letter explaining the denial. That time was entirely reasonable, and no rational trier of fact could find it to be unreasonable and in bad faith. Again, 11333 does not identify any prejudice from that 70-day period, even if it were debatably excessive, which it is not.

Underwriters' actions in processing 11333's claim were reasonable, professional, timely, and did not impair 11333's rights under the 08-09 E&O Policy. No admissible evidence supports a finding of bad faith by Underwriters. Nor does the proffered but

inadmissible expert testimony of Peter Kochenburger. *See* Section III(C)(4), *infra*. Underwriters are entitled to summary judgment against any claim of bad faith.

## 2. Punitive Damages

To receive punitive damages, a defendant must be liable for bad faith and "a plaintiff must prove by clear and convincing evidence that the defendant's conduct was undertaken with an evil mind." *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 517, 144 P.3d 519, 532 (Ct. App. 2006) (internal quotation marks omitted). Underwriters are not liable on the contract or for bad faith, so there can be no punitive damages. Even if Underwriters were liable on a primary tort claim, there is no basis for punitive damages. An "evil mind" requires either that the "defendant intended to injure the plaintiff" or that the "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. Here the undisputed circumstances do not allow an inference of either. Underwriters are entitled to summary judgment against any claim for punitive damages.

### B. Claims Against HUB

HUB procured the 08-09 E&O Policy for 11333. 11333 nevertheless sues HUB in contract and in negligence for not advising and obtaining other insurance that would have covered losses to the Avocet Property after it was foreclosed. HUB seeks summary judgment in its favor against all the 11333 claims.

#### 1. Contract Claims

HUB first seeks summary judgment on 11333's claims of breach of contract and breach of the covenant of good faith and fair dealing.

##### a. Breach of Contract

HUB argues that it cannot be liable for breach of contract because 11333 has produced no evidence the two ever made an agreement, settled on specific terms, or in any other way evinced an intent to be bound to a contract. 11333 acknowledges the two parties never executed a written agreement but contends that the parties had an oral contract with "actual performance and a specific exchange of promises." (Doc. 135 at 5.)

In particular, 11333 argues that in brokering the one policy it did, "HUB promised to provide insurance brokerage services to 11333, including all of those enumerated on its website and as articulated by its representative." (*Id.*) But 11333 offers no evidence of a contract to undertake responsibility for all of 11333's unstated insurance needs.

There is no basis for a breach of contract action against HUB. To the extent 11333 alleges that an oral contract was formed, its factual contentions fail to specify discrete terms bargained for by identifiable agents of each party. *See Savoca Masonry*, 112 Ariz. at 394, 542 P.2d at 819 (enforceable contract requires "sufficient specification of terms so that the obligations involved can be ascertained"). Nor can a contract to survey and provide advice on all 11333's insurance needs be inferred from the parties' course of performance. There was no such course of performance. There was only the procurement of the 08-09 E&O Policy, for which HUB received a commission. *See* Doc. 139 at 11; Doc. 139-1 at 19. HUB actively procured the 08-09 E&O Policy from Underwriters on 11333's behalf. (Doc. 113 at 5; Doc. 142 at 4.) But merely calling an insurance broker for help finding a specific kind of policy does not by itself create a contract binding the broker to meet any and all of the customer's unrequested insurance needs. 11333 has no evidence of a contract with HUB for a general guarantee to ferret out and meet all insurance needs.

11333 cites general services HUB holds out to clients, services such as "[h]elping its clients identify risk and exposure," "[l]ooking at the unique aspects of a client and determining if HUB needs further information to properly procure insurance," and "[p]lacing coverages that fit the client's business and activities." (Doc. 135 at 6.) But 11333 nowhere alleges that these or any other services were promised *to it specifically* as part of a bargained-for exchange. There was not even a general "promise to provide insurance brokerage services" (Doc. 135 at 5), though this could not have formed the basis of a contract action regardless. *See Desilva*, 208 Ariz. at 605, 96 P.3d at 1092. There is no actual evidence that HUB made or breached any promise that would give rise to a contract claim. There is only *ex post facto* wishful thinking.

11333 responds that "the parties' actions, HUB's own website, testimony from [11333's representative], and HUB's representative and its expert, all provide evidence demonstrating the bargain and consideration in this case," a conclusion 11333 believes is reinforced by Arizona's "realist approach" by which "courts [have] the task of upholding the agreements parties intended to make." (Doc. 135 at 8 (citing *AROK Const. Co. v. Indian Const. Svcs.*, 174 Ariz. 291, 295, 848 P.2d 870, 874 (Ct. App. 1993)).) These general sources fail to show any promises or any specifics of what 11333 and HUB promised. 11333 points to no particular statements or conduct indicating that either party sought to be bound by a contract beyond undertaking to get Mortgage Bankers/Brokers Errors and Omissions insurance, let alone what the specific terms of that broader contract were. Vague generalities rarely sustain legal claims. Knowledgeable witnesses under penalty of perjury do. Even taking all of 11333's general circumstances as true, they fall far short of hard evidence that HUB made or breached a contract. It did neither, and summary judgment will be granted in HUB's favor.

### b. Breach of Covenant of Good Faith and Fair Dealing

Likewise, the undisputed facts show no breach of any implied covenant of good faith and fair dealing. 11333 maintains that

> HUB represented that it would procure insurance policies that would cover 11333's negligent errors and omissions, provide accurate information with respect to the existence of coverage for 11333's losses, and procure insurance specially tailored to 11333's business. Instead, HUB considered only its own interests and accepted payment for services that were blatantly deficient, improper, and unreasonable.

(Doc. 135 at 9.) The implied covenant of good faith and fair dealing is not a vehicle for creating contractual terms that the parties did not otherwise agree to; it protects the existing terms from subversion. *See Rawlings*, 151 Ariz. at 153, 726 P.2d at 569 (implied covenant of good faith and fair dealing depends on existence of an "agreement or contractual relationship"). In any event, 11333 makes only conclusory, skeletal

assertions about HUB's motives without any factual flesh on them. There is no evidence of any occasion or way in which HUB "considered only its own interests."

No evidence supports the conclusion that HUB "act[ed] to impair the right of [11333] to receive the benefits which flow from their agreement or contractual relationship." *Rawlings*, 151 Ariz. at 153, 726 P.2d at 569. HUB is entitled to summary judgment against 11333's claim for bad faith.

## 2. Negligence and Professional Negligence

HUB next seeks summary judgment on 11333's negligence claims. 11333 maintains both that HUB failed to take reasonable care and that it failed to adhere to reasonable standards of professional competence in serving as its insurance broker. In other words, 11333 raises two different theories of negligence based on the same facts.

### a. Statute of Limitations

Even assuming there was a tort here, it is now too late to claim it. The negligence claims are barred by section 12-542 of the Arizona Revised Statutes unless "commenced and prosecuted within two years after the cause of action accrues." A.R.S. § 12-542. *See Coulter v. Grant Thornton, LLP*, 241 Ariz. 440, 444, 388 P.3d 834, 838 (Ct. App. 2017) (applying two year limitations period to "claims for breach of fiduciary duty, professional negligence, and negligent misrepresentation"). HUB contends this limitations period begins to run "when an insured becomes aware it is not covered for a loss and sustains damage as a result," which would be no later than March 2009, the latest time 11333 might have learned it did not have coverage for the Avocet Property damage under any policy. (Doc. 113 at 10-11.) 11333 responds that because it chose not to submit a formal claim until between December of 2013 and January of 2014, it did not know it lacked coverage on the 08-09 E&O Policy until Underwriters denied the claim in March 2014. (Doc. 135 at 11.)

Arizona follows the "discovery rule," under which "a cause of action does not 'accrue' until a plaintiff discovers or by the exercise of reasonable diligence should have discovered that he or she has been injured by the defendant's negligent conduct."

*Coulter*, 241 Ariz. at 444, 388 P.3d at 838 (citing *Anson v. Am. Motors Corp.*, 155 Ariz. 420, 423, 747 P.2d 581, 584 (Ct. App. 1987)).  In order to raise a claim of professional malpractice, "[a] plaintiff must still have suffered 'actual damage or injury' that often does not occur until certain issues are litigated and finally determined." *Manzanita Park, Inc. v. Ins. Co. of North America*, 857 F.2d 549, 558 (9th Cir. 1988) (applying Arizona law).[8]  However, "[c]ommencement of the statute of limitations will not be put off until one learns the full extent of his damages." *Commercial Union Ins. Co. v. Lewis & Roca*, 183 Ariz. 250, 255, 902 P.2d 1354, 1359 (Ct. App. 1995) (internal quotation marks omitted).  It is enough to start the limitations period that the plaintiff suffered some damages even if further injury follows. *Id.*

Let it be assumed without deciding it that the statute of limitations on 11333's negligence claim against HUB did not commence until Underwriters denied coverage on the policy.  If so, then 11333 breached its duty of good faith and fair dealing by delaying presenting a claim to Underwriters under the 08-09 E&O Policy for nearly five years after HUB told 11333 it had no coverage—twice the length of the statute of limitations that protects HUB.  11333 did not exercise "reasonable diligence" after learning of its loss and after being told it had no coverage under the 08-09 Policy.  *See Coulter*, 241 Ariz. at 245, 388 P.3d at 838.  11333 had no justification for delaying the notice until after the end of litigation for claims against different underwriters on the Fund's 2010-2011 policy.  It could and should have presented its claim to Underwriters in 2009 and

---

[8] In certain situations a claim does not accrue until after other litigation has concluded unsuccessfully.  For example, legal malpractice in litigation does not accrue until the underlying litigation ends.  The client is not harmed until then. *See Amfac Dist. Corp. v. Miller*, 138 Ariz. 155, 673 P.2d 795 (Ct. App. 1983).  This is a practical necessity or else the client could turn on his lawyer at a time when the lawyer could still fix the mistake (many mistakes in litigation can be fixed).  Requiring a client to sue his attorney before the end of the case in which the malpractice arose would destroy the attorney-client relation when it is still mutually advantageous to continue the relation.  In contrast, in an insurance case like this there is no disadvantage in suing the insurance broker promptly after learning that the insured suffered a loss and the broker concedes there is no insurance coverage.

would have been denied.  It could have pursued its claims against the different consortiums on both the 08-09 policy and the 10-11 policy at the same time.  11333 acted with the opposite of diligence and good faith, and it cannot be said otherwise.

The negligence claims against HUB are therefore time barred under section 12-542.

### b.  Merits

HUB also argues that 11333 has not shown that any purported negligence caused 11333 any injury.  In particular HUB argues 11333 has failed to show it either would or could have purchased additional insurance it maintains HUB was negligent in failing to procure.

11333 has not demonstrated HUB was professionally negligent for failing to procure better errors and omissions coverage that would have covered this loss because 11333 has not presented any evidence that such coverage was even available.  11333's only basis for saying HUB would have obtained a policy covering "all risks" is expert testimony by William Bittner—who admitted to basing his opinion on speculation.  (Doc. 113 at 15.)  11333 does not directly dispute this, nor has 11333 offered any evidence that such a policy existed or could have been negotiated.  Bittner admitted that he had unsuccessfully tried to change the "Fire and Extended Coverage" language on a similar policy when acting as an insurance agent for a customer.  (Doc. 113 at 15.)  A wild guess grounded in no knowledge is not evidence and does not create a triable issue of fact to defeat summary judgment.  11333 has therefore presented no evidence that coverage broader than the 08-09 E&O Policy and broad enough to cover the losses here even existed.  It cannot be negligence that HUB did not obtain the non-existent.

HUB's additional arguments need not be addressed since the above discussion suffices for summary judgment.

### C. Motions to Exclude Expert Witnesses

Summary judgment is granted on all claims without the need to decide the challenges to expert testimony.  The Court has determined that 11333 suffered no

covered loss as a result of Hurricane Ike.  *See* § III(A)(1)(b), (c) *supra*.  The Court has further determined that all of 11333's claims against HUB fail as a matter of law. However, the parties have expended considerable resources in challenging and defending expert testimony, so those motions will now be considered, notwithstanding the conclusions above, in hopes that it will assist the parties by narrowing the range of uncertainty in this case.

### 1. John McReynolds

Underwriters offer John McReynolds's expert testimony regarding the condition of the Avocet Property.  Among McReynolds's qualifications, he is "a former residential homebuilder, general contractor, and a residential and commercial remodeler."  (Doc. 126 at 2.)  He is also a member of several professional organizations and "Texas Windstorm Certified and National Flood Insurance Program Certified" (*id.*), though he does not explain what those designations mean.  *See* Doc. 126-1 at 3-4.  11333 moves to exclude McReynolds on the grounds that he lacks (1) sufficient experience with raw land and beachfront properties, (2) engineering credentials, and (3) qualifications for interpreting satellite photos, understanding land recovery, or securing property.  (Doc. 120 at 4-10.)  11333 also contends he has formed his opinions based on unreliable evidence and speculation.  (Doc. 120 at 10-15.)

"Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert."  *Thomas*, 42 F.3d at 1269.  In addition to his on-the-ground experience, McReynolds completed extensive coursework in home construction and remodeling.  (Doc. 120 at 4.)  While he does not have hands-on experience developing raw land (Doc. 116-10 at 8), that may not be critical to the testimony he offers.  McReynolds meets the threshold under Rule 702.  His expert testimony is not excluded in general.  However, his testimony may be challenged at trial based on his qualification and foundation for specific questions.

### 2. Chandra Womack

11333 offers Chandra Womack, an engineer, as a rebuttal witness to McReynolds.

McReynolds gave an 85-page report about the condition of the Avocet Property after Underwriters had specifically told 11333 they would not offer expert testimony on that subject. (Doc. 129 at 1.) Womack submitted an initial report but added a "supplemental report" with new opinions two days before her deposition. (Doc. 107 at 2.) Underwriters seek to exclude the opinions in her supplemental report as produced past the deadline, which they contend prevented them from deposing her adequately. (Doc. 107 at 2.) Underwriters' eleventh-hour *volte face* on offering McReynolds made Womack's testimony necessary and justified the late supplement. Moreover, Underwriters have not identified any part of Womack's supplemental report that they were unable to question her about. (Doc. 129 at 11.) Since Womack is a rebuttal witness to McReynolds and both were late, either both get to testify or neither does. Womack's testimony is therefore not excluded.

### 3. Nigel Hughes

11333 offers Nigel Hughes as an expert on its economic loss from Hurricane Ike. Underwriters move to exclude Hughes for three reasons: (1) he incorrectly assumes that 11333 sustained a loss when the Avocet Property was damaged, (2) he incorrectly pinpoints the relevant start dates for calculating loss, and (3) he incorrectly assumes that In athe 08-09 E&O Policy covers the failure to obtain business interruption coverage. (Doc. 103 at 2.) However, as 11333 points out, "[t]here is no dispute . . . regarding Mr. Hughes'[s] core analysis and methodology." (Doc. 124 at 1.)

Because Hughes's methodology and expert qualifications are both undisputed, his testimony will not be categorically excluded. As to the three arguments raised by Underwriters, the Court would have to determine them based on the issues remaining disputed at trial. That determination cannot be made at this stage.

### 4. Peter Kochenburger

Finally, 11333 offers expert testimony of Professor Peter Kochenburger about bad faith, including claims handling. Underwriters move to exclude him on the grounds that (1) he lacks qualification for his opinions concerning bad faith and claims handling and

(2) his opinions lack reliability for several reasons.

As for qualification, 11333 points to Professor Kochenburger's "11 years as in-house counsel at Travelers Property Casualty" and more than ten years teaching law courses that "emphasize insurance industry practice and standards, insurance regulation, claims handling requirements, policy interpretation, and the obligations and rights of the insurers, policyholders, and insurance agents and brokers." (Doc. 125 at 2.)

Professor Kochenburger is qualified as an expert in wide areas of insurance. But qualification in a field in general is not necessarily qualification to opine on anything. The touchstone "is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994); *see, e.g.*, *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.,* 389 F. Supp. 2d 1145 (D. Alaska 2005) (witness with 45 years' experience in marine insurance not qualified to opine on materiality of information sought in application for marine pollution insurance because he had no knowledge of policies and practices in such underwriting and only minimal, sporadic knowledge of such insurance); *Travelers Prop. Cas. Co. of Am. v. Nat'l Union Ins. Co of Pittsburgh, PA,* 557 F. Supp. 2d 1040 (W.D. Mo. 2008) (experienced witness on insurance brokerage not qualified to opine on subrogation, of which he was only aware from discussions with clients).

It is a fact-specific inquiry whether a specific question or sub-area is close enough to or too far from an expert's experience and learning. Professor Kochenburger's experience in claims handling and bad faith is thinner, as some of his opinions themselves show. But he does not fall short of the minimum qualification for admissibility. In the olden days, qualification of an expert was the only judicial restraint on the excesses of expert witnesses, hence the huge investment in challenging qualifications. But it is no longer so.

Now expert opinions must also be based on adequate facts, sound reasoning and reliable methodologies, failing which they are inadmissible. Each opinion must be

"based on sufficient facts or data" and be "the product of reliable principles and methods," which "the expert has reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Professor Kochenburger's opinions on bad faith suffer from fatal flaws in factual basis, methodology, and reliability.

First, he grounds his opinions on irrelevant and even mistaken premises about actions and claims handling in the Fund's earlier case against a largely different set of Lloyd's underwriters on a different policy for the 2010-2011 time period.[9] *See, e.g.*, Doc. 105 at 16-21. That is not relevant to Underwriters' liability for their acts and claims handling in this case. It would not be relevant even if the same underwriters were involved, which they were not. People pay for their torts once, not over and over again with each new tort. If actions from the earlier case involving the Fund against other underwriters have even theoretical relevance to this case, they would not survive the balancing test of Federal Rule of Evidence 403. The Court finds any probative value would be substantially outweighed by the risk of confusing the jury about what is in trial and by waste of time and resources. The Court would exclude such facts under Rule 403. Those expert opinions are not grounded in the kind of evidence an expert may rely on under Rule 703, as they are hearsay of adjudicative facts specific to this case.

Second, the core of Professor Kochenburger's methodology is that though no single act alleged by Underwriters suffices as bad faith, "the accumulation of claim handling actions and decisions" to protect their own interests—while each individually lawful—constitute a breach of the implied covenant. (Doc. 105 at 16.) The worst Professor Kochenburger says about some actions is that they deviated from industry customs and practice (which is not the test for bad faith liability) or risked "creating an oppositional relationship," despite being within the insurer's rights under the policy or

---

[9] Moreover, a running confusion throughout Kochenburger's opinion is that he attributes various purported acts of bad faith to "Lloyd's." *See, e.g.*, Doc. 105 at 15-19. Lloyd's is not a party to this case. Evidence of bad faith by Lloyd's is thus irrelevant and would be excluded at trial. The Court assumes here that by "Lloyd's," Kochenburger means also to encompass Underwriters, defendant in this case, except where his opinion indicates otherwise (such as, e.g., where it specifically references the underwriters who were a party to the previous litigation against the Fund).

the law.  *See* Doc. 105 at 16-23.  It departs from settled law to say these amount to bad faith in the aggregate despite falling short or passing muster individually.  Conclusions from that invalid methodology are not valid, admissible expert opinions.

Professor Kochenburger's opinions are organized around three non-discrete sections: failure to consider interests equally, failure to investigate, and claim handling procedures.

### a.  "Lloyd's did not treat its policyholders' interests equally"

Professor Kochenburger first points to various instances of alleged bad faith by the separate defendants in the 2013 litigation with the Fund, all of which occurred before 11333 made the claim in this case, before which there could be no duty in the processing of this case.  *See* Doc. 105 at 16-17.  None of those instances is relevant to this case and most or all of them were benign and lawful in any event. Professor Kochenburger's reliance on them invalidates rather than supports his opinion of bad faith.  The assertions he makes include:

--Underwriters' "first actions . . . in both 2011 and 2014 was [sic] to hire outside counsel to 'protect their interest.'"  (Doc. 105 at 16.)   Hiring a lawyer is a right, not a tort.

--In the 2011 case, the underwriters of the Fund's policy relied on the opinion of outside counsel in denying coverage.  (*Id.* at 18.)

--On the 2011 tender, outside counsel noted the loss occurred in 2008, might be untimely, and suggested getting "additional information regarding date of discovery." (*Id.* at 16.)  That was obvious, and it might have been malpractice not to suggest as much.

--In the 2011 case, the underwriters to the Fund's policy should have searched earlier policies to see if there was earlier coverage for the loss, for which no claim had been made.  (*Id.* at 16-17.)

--In the 2011 case the underwriters to the Fund's policy did not advise the Fund to search their own other policies, which was obvious and the Fund did anyway, and there was nothing to find.  (*Id.* at 17)

1    --In the 2011 case they successfully opposed a belated motion to delay that case by
2    amending to add claims under the 2008 Policy.  (*Id.* at 17.)  It is not a tort to win in court.

3    --Underwriters would not waive the requirement of notice of claim and just accept
4    the whole file in the Fund's pending litigation on the 2010-2011 policy in lieu of a claim
5    under the 08-09 E&O Policy.  (*Id.* at 17.)  But Professor Kochenburger also admits that
6    Underwriters "had a contractual right to insist on a formal tender to the broker" (*id.*),
7    invalidating his opinion that it contributed to actionable bad faith to do so.  Underwriters
8    did not have to justify their insistence on compliance with notice requirements of the 08-
9    09 E&O Policy.  But it was plainly justified to lock 11333 into what it was claiming and
10   not just infer from a voluminous court file in a different case what 11333 might claim.

11   --Underwriters denied coverage 70 days after receiving the claim.  (*Id.* at 17-18.)
12   As a matter of law, that was a reasonable time to investigate and respond with an
13   extended nine-page explanation to a demand of this magnitude.  *See* Doc. 111-3 at 55-63.

14   --Underwriters investigated grounds for rescission rather than just paying the
15   claim, which shows they "were only looking after [their] own interests."  (Doc. 105 at
16   18.)  But Professor Kochenburger correctly admits an insurer is "certainly entitled to
17   investigate and contest claims."  (*Id.*)

18   --Both Underwriters and 11333 dealt with each other through their respective
19   outside counsel.  (*Id.*)  Professor Kochenburger concedes that an insurer "can manage its
20   policyholder's claim through its own outside counsel," but nevertheless says the insurer's
21   use of outside counsel in this case is evidence of bad faith because it risked "creating an
22   oppositional relationship."  (*Id.*)  Taking an action that merely "risks creating an
23   oppositional relationship" cannot be grounds for bad faith.  As a matter of law, it cannot
24   be bad faith for an insurer to deal with an insured through outside counsel.  It is
25   unreasonable to say an insured who initiates and maintains communications through its
26   own outside counsel has a bad faith claim against an insurer who responds through the
27   insurer's outside counsel.  Professor Kochenburger cites no authority for his contrary
28   opinion.

--"[I]t appears that outside counsel made the primary claims handling decisions." (*Id.*) This is pure speculation. But even if true, it is not bad faith unless the actions of counsel were bad faith. If it is not otherwise bad faith, it does not become bad faith merely because an authorized counsel acted for the insurer. An opinion of bad faith grounded in that false premise of law is not admissible.

--It was bad faith that in 2012 "when the Fund sought renewal of the Lloyd's policy, Lloyd's told . . . the broker that it would only consider renewal *if* the Avocet claim was dropped." (*Id.* at 19 (emphasis in the original).) Once again, by 2012 the Underwriters' 2008 Policy with 11333 was long expired and not there to renew. Moreover, absent a contractual duty to do so, people do not have to enter into new business with other people, as Professor Kochenburger admits. Declining new business does not deprive a contracting party of any right under an existing contract.

There is no admissible opinion testimony here that Underwriters failed to give equal consideration in the circumstances of this case or that there was any delay or other prejudice to 11333.

### b. Duty to Investigate

Professor Kochenburger lists examples of supposed failures to "meet industry standards for claim investigation." (Doc. 105 at 20.) None withstands scrutiny as sufficient basis and method for an opinion of bad faith.

He first asserts two purported grounds for bad faith grounded in the Fund's earlier claim and lawsuit on its separate policy. (Doc. 105 at 20-21.) Once again, these are not relevant to the action here, which involves only the 08-09 E&O Policy.

Professor Kochenburger contends Underwriters failed to conduct an investigation or "search for coverage" when it received the claim in 2014. (*Id.* at 21.) As already discussed, a simple reading of the 08-09 E&O Policy yielded a reasonable claims-made defense that both sides litigated on a motion to dismiss. *See* § III(A)(1)(d), *supra*. That interpretation was ultimately incorrect, but the position was reasonable on the claim then five years late. So was the assumption that no further investigation was then necessary.

No additional facts could have undone Underwriter's claims-made defense, only a different reading of the policy language.

Professor Kochenburger then contends it was bad faith for Underwriters not to "reevaluat[e] its coverage denial and then conduct for the first time a proper claims investigation" after this Court rejected the claims-made defense. (Doc. 105 at 21.) This tries to slip in new claims not raised in the complaint. If Underwriters engaged in bad faith after the motion to dismiss was filed here, 11333 can seek to amend its complaint or file a new action, but it cannot bring in evidence of purported bad faith not alleged in the complaint. In any event, the investigation was continued in the relevant respects. Just saying it was not so does not make it not so. Professor Kochenburger does not identify any deficiency in the investigation, much less one that could have blunted the fatal consequences of 11333 not having a mortgagee interest or an owner interest and of no one having an investor interest.

### c. Claims Handling

At the threshold, Professor Kochenburger's opinion that the handling procedures "were below expected industry standards" (Doc. 105 at 21) is not alone sufficient foundation or methodology for an opinion of bad faith. He states no harm from any of Underwriters' purported shortfalls, just that some practices in general fall short of industry standard. They are: on the job training of adjusters, hiring (and training) adjusters new to the insurance industry, not having written claims handling manuals, unfamiliarity with some principles stated by the Lloyd's market generally for its syndicates, lesser documentation in the file, and assumed lack of supervisory review of the denial of coverage (when relying on the extensive work of outside counsel). (Doc. 105 at 22.)

Professor Kochenburger does not comment on the extent to which the claims handling here did comply with industry standards, only that the insurer's general practices deviated in some respects. Nothing in the opinion connects any of the shortcomings with any prejudice in this case. None of the listed shortcomings has

anything to do with the substance of the processing of this case. These are insufficient facts and data to opine on bad faith. The only theory would be a kind of strict liability for bad faith based on inconsequential differences from perfect compliance with all his identified industry standards. That is not what bad faith claims handling is about. That is not a valid methodology, it is sometimes contrary to law, and it does not pass as admissible expert opinions.

Professor Kochenburger's opinion testimony is tainted by repeated fault-finding for conduct that is indisputably routine, reasonable, and even legal by contract or law, which he darkly finds to be evidence of bad faith nonetheless. It is further tainted by its substantial reliance on irrelevant actions in earlier litigation before 11333 submitted its claim in 2014 and gave rise to the duty of good faith claim processing. Oftentimes it is just imaginative advocacy.

Professor Kochenburger's tendered opinions about bad faith will be excluded for those reasons and because they lack basis in sufficient facts and data, are not the product of reliable principles and methods reliably applied, and are sometimes contrary to law.

IT IS THEREFORE ORDERED that:

(1) Plaintiff's Motion to Exclude Opinions and Testimony of John McReynolds (Doc. 120) is denied, subject to specific renewal for foundation for specific questions.

(2) Defendant Underwriters' Motion to Exclude Womack's Supplemental Report (Doc. 107) is denied, subject to specific renewal for foundation for specific questions.

(3) Defendant Underwriters' Motion to Exclude Nigel Hughes's Opinions and Testimony (Doc. 103) is denied, subject to specific renewal for foundation for specific questions.

(4) Defendant Underwriters' Motion to Exclude Peter Kochenburger's Expert Report and Testimony (Doc. 106) is granted.

IT IS FURTHER ORDERED that Defendants' Motions for Summary Judgment (Docs. 109, 113) are granted.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment (Doc. 142) is denied.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants Certain Underwriters at Lloyd's, London and HUB International Insurance Services, Inc. against Plaintiff 11333, Incorporated, and that Plaintiff take nothing.

The Clerk shall terminate this case.

Dated this 13th day of June, 2017.

Honorable Neil V. Wake
Senior United States District Judge